RECEIVED

UNITED STATES DISTIRCT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

CASE NO. 2:23 CV 0517

Reese C. Dehen,

    Plaintiff,

vs.

Ohio State University

    Defendant.

COMPLAINT

JUDGE SARGUS

MAGISTRATE JUDGE JOLSON

Plaintiff Reese C. Dehen, for her claim for relief against the defendant, states and alleges the following:

## PARTIES AND VENUE

1. Plaintiff Reese C. Dehen, at all times material herein, is a resident of the City of Ramsey, County of Anoka, State of Minnesota.

2. Plaintiff is an accepted incoming student for the class of 2021 at defendant Ohio State University, hereinafter, "OSU" and is currently attending OSU.

3. Before attending OSU, at all times relevant herein, Plaintiff attended a high school at Anoka High School in Minnesota and accumulated a weighted GPA of 4.21 with a 2/559 class rank, an unweighted GPA of 4.0 with a 1/559 class rank and a year of college coursework at the local community college through a program known as Post Secondary Educational Opportunity (PSEO).

4. OSU is a State University in the City of Columbus, County of Franklin, State of Ohio.

## FACTS

5. OSU has a top-notch women's and men's swimming program. In 2020 and before, OSU was actively recruiting various men women throughout the United States for its 2021 incoming class. On or about August 2020, OSU coach Bryon Tansel, hereinafter coaching staff, contacted Plaintiff for purposes of recruiting her to swim for the women's team in the year commencing in the fall of 2021 through 2025.

6. That during that recruitment process because Plaintiff was not offered a full athletic scholarship discussions were had between coaching staff, Plaintiff, and her parents regarding athletic and merit-based scholarships. Also, there were some offers and discussions regarding what amount an athletic scholarship would likely be.

7. That during that athletic recruitment process, because Plaintiff was also a very high academic achiever, specific discussions were had regarding available merit-based scholarships- particularly the National Buckeye Merit Scholarship, hereinafter "NBMS", that was available to qualifying non-Ohio State residents such as Plaintiff based upon merit with the criteria as listed on the OSU website. (It is well known that OSU and other colleges can spread its athletic monies farther and entice and field a more competitive team if merit scholarships can supplement the full financial package awarded a student athlete.)

8. At the relevant time immediately before submitting her application for admission, the NBMS criteria as listed on OSU's website stated the NBMS scholarships are awarded to those applicants "who are highly competitive as demonstrated through grade point average, class rank (if available), and ACT or SAT scores (if available.)". A further

requirement was that the applicant had to apply by November 1, be enrolled fulltime and have and a minimum GPA of 2.5. This criteria listed on the website was the only criteria listed by OSU.

9. That Plaintiff met the listed criteria and would have been at the top of the rankings for the incoming class of 2021.

10. That the money-based equivalent, if a non- resident student were to receive the NBMS, is approximately $13,500 per year or $54,000 over the anticipated four years of college.

11. As a result of the athletic discussions and strong potential for the NBMS, Plaintiff was requested by coaching staff that she forward her high school and college transcripts (the high school transcript also contained her college coursework) to the coaching staff for review and that coaching staff would in turn forward those to an academic liason/advisor working with coaching staff to determine her likelihood of obtaining the NBMS. Plaintiff advised her coach in that discussion that her class rank was first or second out of 559 students depending on whether her GPA was weighted or unweighted.

12. This forwarding of transcripts request by coaching staff was also done so plaintiff (and coaching staff) could determine Plaintiff's likely overall OSU financial exposure, both athletic and merit based, for the anticipated four years at the college.

13. Plaintiff complied with the coaching staff request and forwarded those transcripts to coaching staff at OSU.

14. Plaintiff and her parents, who were present during the scholarship negotiations, were clear in the negotiation process with coaching staff that the proposed athletic scholarship would have to be supplemented by a merit-based scholarship (NBMS) to make her attendance at OSU financially feasible given more lucrative scholarship offers from other

colleges. All parties to the discussions understood Plaintiff's need for both athletic and merit scholarships to maintain attendance starting in the fall of 2021.

15. Following that submittal of Plaintiff's transcripts to coaching staff and review by the coaching staff and presumably the student liason/advisor, plaintiff received positive news from coaching staff that given her high academic accolades, it was anticipated she would very likely receive the NBMS.

16. Plaintiff, excited about the prospects of attendance, then began the application process. A discussion ensued with her coaches about submission of ACT scores as part of the application process and whether those were needed. Plaintiff conveyed her difficulties to her coach in sitting for testing given the testing unavailability as a result of the COVID 19 virus restrictions.

17. Meanwhile, across the country, the outbreak of the COVID 19 virus significantly limited the incoming class of 2021 student's ability to sit for ACT testing. Facing a possible declining enrollment in part due to the COVID 19 restrictions, OSU made the decision to waive the requirement for ACT/SAT scores for incoming 2021 students with respect to admission and more specifically for NBMS consideration and indicated that waiver of testing on the FAQ of OSU's website.

18. The following FAQ appeared on OSU's 2020 website for 2021 applicants: "I'm applying to be a first-year student. Do I need to submit a test score to be considered for Honors and Scholars Programs, merit scholarships or the Morrill Scholarship Program? No. First-year applicants will receive **FULL CONSIDERATION** for these programs and scholarships even if they are unable or choose not to submit a test score." Emphasis added.

19. Although OSU never defined the term "full consideration" on its website or in other documents to Plaintiff's knowledge, a reasonable person would interpret the language of "will receive full consideration" as an equal or near equal opportunity of securing a NBMS based upon GPA and class rank alone versus securing a NBMS based upon ACT/SAT test scores and top 25% class rank as had been past practice pre COVID restrictions. Anything short of equal treatment or non-penalizing treatment would be considered "partial consideration" or just "consideration"-not the website stated "full consideration".

20. In other words, the spirit of OSU's waiver of ACT/SAT testing was to not penalize those applicants who did not or were unable to submit test scores for the admission year 2021. Further, it is believed the words "full consideration" for admission and scholarships was used by OSU admissions staff as a deliberate strategy to entice more students to apply for admission during the COVID 19 pandemic where ACT/SAT testing for students was problematic.

21. Based upon the website waiver of ACT/SAT tests, the applicant eligibility pools for NBMS's became twofold---one applicant pool relying on ACT/SAT test scores and the other applicant pool relying on GPA and class rank, if available---both pools subject to the "full consideration" representation.

22. Prior to OSU's 2021 incoming class, there was a mandatory requirement for submission of ACT/SAT scores for NBMS consideration.

23. Among other things, in addition to the website FAQ above regarding test score consideration, coaching staff independently confirmed to Plaintiff that test scores were not needed for incoming 2021 students. Coaching staff further stated to Plaintiff that

Plaintiff would not be penalized for not submitting a test score. Coaching staff further advised Plaintiff that unless she received a 29 or higher on her ACT that she should not submit any test score because that may actually hurt her prospect of obtaining the NBMS. Coaching staff further stated to Plaintiff and her parents that if she did not receive the NBMS with her exceptional GPA and class rank alone, then who would?

24. The 29 ACT minimum ACT score stated immediately above was stated to Plaintiff because for the class of 2020 (2020 being the year prior to Plaintiff's admission), the criteria for the NBMS consideration was top 25% of the class and have an ACT composite score of 29 or higher or SAT Evidence-Based Reading and Writing + Math score equivalent of 1330 or higher.

25. Given Plaintiff's high academic achievement, the prescreening of her transcripts and class rank by the coaching staff advisor/liason, the advice of her coaching staff, the information contained on the website for "full consideration" with or without ACT/SAT scores, Plaintiff reasonably relied upon all those statements and advice and opted not to pursue further efforts to submit or sit for an ACT test —in essence following the advice of her coaching staff.

26. Plaintiff then solidified her commitment to OSU athletics by signing a letter of Intent to attend OSU on November 11, 2020. She submitted the appropriate application without ACT/SAT scores as part of her early admissions process which was finished before November 1, 2020.

27. Reasonably relying on all the information she received from coaching staff and OSU's website, Plaintiff then advised and terminated interest and scholarship offers from other colleges that were in the process of recruiting her of her commitment to OSU. She began

attending numerous zoom meetings with her future teammates. Plaintiff also secured her planned roommate.

28. Plaintiff was advised by coaching staff that she would probably receive a decision on the NBMS in approximately February, 2021.

29. However, Plaintiff and several thousand other 2021 OSU applicants had no knowledge that OSU either negligently or intentionally would later create a defect in the application process (at least the NBMS process) causing OSU to deviate from its representations on the website and penalize and give inferior status to those applicants like Plaintiff who did not submit ACT/SAT scores. These OSU created defects and deviations and subsequent lack of an interest on the part of OSU to correct said defects and deviations following being given notice thereof led to the inevitable litigation that accompanies ill-conceived and poorly executed government programs.

30. When Plaintiff received her financial aid package it did not include the NBMS which meant she did not receive the NBMS. She eventually made contact with OSU and was advised that she was not a recipient of the NBMS—in spite of her impeccable academic achievement. This negative news immediately financially impacted her with the reality that she needed to find $54,000 additional monies for those four years or look for another school she could afford.

31. Another reality and detriment (damages) to Plaintiff was that because the athletic swimming recruiting process was largely complete before her letter of intent was signed for the class of 2021, most if not all, athletic departments from other colleges had used all their athletic monies on already signed athletes. In essence, Plaintiff's new reality was that if OSU was not viable financially, it meant she would not receive any athletic monies

elsewhere leaving only a "walk on" option at other schools. (Plaintiff had other desirable scholarship offers from other colleges and likely would have entertained those offers had OSU not negligently or intentionally misrepresented facts on it's website.)

32. Plaintiff then advised coaching staff that she was not a recipient of the NBMS.

33. Coaching staff was embarrassed and perplexed by her lack of award and devised some written "talking points" for Plaintiff to help emphasize in an appeal of the OSU's decision not to award Plaintiff the NBMS. Based upon those talking points, Plaintiff surmised coaching staff intimated that the lack of award of the NBMS may have been due to Plaintiff being an athlete. Coaching staff also later advised Plaintiff that he would attempt to arrange a meeting with the "financial people" and the athletic director to see if there was any process to help Plaintiff or rectify the injustice. However, this meeting never took place to Plaintiff's knowledge and coaching staff eventually acknowledged to Plaintiff and her parents that there was nothing further they could do to help Plaintiff with the merit-based process.

34. Given her impeccable high school academic achievement, Plaintiff began to have suspicions that those unknown decision makers or unknown scholarship rankers on the award of the NBMS had not in fact truly waived the ACT/SAT scores and/or had not given "full consideration" to those who did not submit test scores but instead penalized Plaintiff and other OSU applicants by giving them only partial consideration. Plaintiff also began to have suspicions that those unknown decision makers and unknown scholarship rankers had not taken the necessary care to carefully examine her class rank and GPA and had recklessly and unjustifiably penalized categories of potential students like her and possibly considered other improper criteria not listed on the website.

35. Plaintiff reached out to a fellow out of state incoming freshman who revealed to her that he received a NBMS with a GPA of 3.7 (substantially lower than Plaintiff) and an ACT score of 30.

36. Plaintiff became more suspicious of OSU shenanigans involving the award for the NBMS when she was intentionally stonewalled in her request for information regarding her rank among other applicants. In the ensuing months after her denial of the NBMS, Plaintiff attempted three times via email to set up a meeting with a committee or spokesperson who made the decision, to obtain rationale and criteria including her rank among other candidates, to appeal or to get OSU to reconsider its decision. Plaintiff was stonewalled and was intentionally refused any meeting or data as requested. Plaintiff was eventually advised by undergraduate admissions person Josephine West that there was no appeal or reconsideration process.

37. OSU continued to be stiff-necked with Plaintiff's parents who were seeking to assist Plaintiff in pressing for her rank among candidates. On March 31, 2021, Plaintiff's father attempted to get largely the same information Plaintiff had previously requested from the general counsel of OSU Paula Paoletti. Ms. Paoletti simply forwarded the March 31, 2021 letter to undergraduate admissions for a response.

38. The response Plaintiff received from Executive Director for Undergraduate Admissions Beth Wiser was that she had "leadership take a look at her [Plaintiff's] application again and our second look confirmed that decision"---that being Plaintiff was not awarded the NBMS. Notably, Ms. Wiser intentionally refused to provide the ranking data.

39. On April 21, 2021, Plaintiff's father then made a public records request under the state of Ohio's Sunshine laws, hereinafter "Request 1", to Scott Hainer who is the Director of

public records at OSU, hereinafter Hainer. Plaintiff's father received a response with scant data. In spite of the attorney general's public website statements made to maintain transparency, Mr. Hainer refused to provide one supporting document to Request 1.

40. However, based upon the response to the Request 1, Mr. Hanier stated that there were 11,170 eligible applicants with 5508 NBMS that were awarded to the incoming class of 2021.

41. Based upon the response to the Request 1, Mr. Hanier stated that only 1071 NBMS were awarded to those applicants who did not submit ACT/SAT scores (19%) while 4437 NBMS were awarded to those applicants who did submit ACT/SAT scores (81%).

42. Based upon the response to the Request 1, Mr. Hanier stated that there is no data or documents evincing the identity of the person or persons making the decision to award to NBMS for the incoming class of 2021.

43. Based upon the response to the response to the Request 1, Mr. Hanier stated that there is no data or documents giving the rank of the applicants eligible for the NBMS for the incoming class of 2021.

44. Based upon the response to the Request 1, Mr. Hanier stated that there is no data or documents giving the criteria and rationale for separating the eligible applicants in order to award the NBMS for the incoming class of 2021.

45. Based upon the response to the Request 1, Mr. Hanier stated that there is no data or documents defining OSU's use of the term "full consideration" as it pertains to awarding the NBMS.

46. Based upon the response to the Request 1, Mr. Hanier stated that is no data or documents evincing any COVID-19 related policy changes in NBMS criteria from the 2020 class to the 2021 incoming class.

47. Based upon a plain and reasonable interpretation of data in the response to the Request 1 of Mr. Hanier, if "full consideration" equates with equal or non-penalizing consideration, then ½ of the total awarded NBMS of 5508 equals 2754. Since only 1071 NBMS were actually awarded to applicants not submitting ACT/SAT scores, there should have been 1683 more NBMS's available to that "class" of students that did not submit test scores.

48. Therefore, given the totality of the circumstances, OSU's website statement of "full consideration" to Plaintiff and that "class" of other students in that 2021 class of applicants who were unable or chose not to submit an ACT/SAT score is disingenuous, factually untrue, fraudulent, misleading and continues to be misleading.

49. As indicated above, by OSU's responses to Request 1, OSU through Mr. Hanier as a record custodian, has indicated it has no person, data or documents that would rank an applicant--- a bold faced misrepresentation since OSU has to rank the applicants to make an award.

50. Based upon OSU's response to the Request 1, OSU's own statistics indicate a lack of truthful website disclosure that yields a less than 1 out of 5 chance of receiving the NBMS if an applicant did not submit an ACT/SAT score.

51. OSU intentionally or negligently failed to advise Plaintiff and others of this huge disparity, namely, that OSU would be giving substantially more weight to those applicants submitting an ACT/SAT score than those that did not.

52. Plaintiff and others relied on those promises of "full consideration" of their GPA and class rank. In Plaintiff's case, she further relied on the advice from her trusted coaching staff that given her academic accolades no ACT/SAT scores were necessary to obtain the NBMS. Plaintiff and her coaches were duped to believe OSU was going to honor its written website promise to not disadvantage or penalize those who did not submit an ACT/SAT score.

53. Plaintiff would have received the NBMS had OSU truthfully given full consideration of her GPA and class rank.

54. Nowhere in OSU's website did OSU claim it was going to give the applicants not submitting a ACT test scores just "consideration". Nowhere in the database or website did OSU claim it was going to give the applicants not submitting test scores "partial consideration".

55. One coach commented to Plaintiff and her parents, that this (lack of award to Plaintiff with her stellar academic accolades) makes everyone look bad---coaches and the university.

56. OSU's conduct during and after these website misrepresentations further show a willful indifference to the rights of others supporting an award for punitive damages.

## CLAIMS FOR RELIEF

### NEGLIGENT MISREPRESENTATION

57. The Ohio Supreme Court set forth the standard for negligent misrepresentation: A person who, in the course of his business, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by

their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

58. It is undisputed that OSU provided written website information, namely that it was acceptable for NBMS consideration not to submit ACT/SAT scores for NBMS consideration.

59. The OSU website uses the term "full consideration" for those applicants that do not take or choose not to submit ACT/SAT scores.

60. Coaching staff expounded on that website information and further attempted to guide and provide athletes like Plaintiff advice including making oral representations on the prudence of submitting ACT/SAT scores as part of the application process.

61. Plaintiff justifiably relied on the valid expert advice of her coaches and the student liason.

62. Coaching staff stated that if Plaintiff cannot get a NBMS with her academic accolades alone and without an ACT test score, who can?

63. In addition to the coaching representations, before deciding not to submit ACT/SAT scores as part of her OSU application, Plaintiff was also given written representations by OSU on the it's website that she would be given "full consideration" for NBMS regardless of her decision to submit or not submit ACT/SAT scores.

64. Responses provided by OSU in its response to a public data Request 1, indicates the huge inequality of NBMS consideration (81%) given to applicants who submitted test scores versus (19%) consideration given to those applicants who did not submit test scores—certainly not the "full consideration" OSU represented on it's website to prosepective applicants. This 19/81 percentage disparity is not a negligible difference and constitutes a fraud or misrepresentation.

65. This inequality of consideration resulted from OSU's intentional act or negligent conduct in failing to exercise reasonable care in establishing appropriate decision makers, rankings, and following its own website criteria.

66. OSU reaped the benefit of thousands of dollars in application fees from those applicants like Plaintiff who were not able to submit or those choosing not to submit test scores— many like Plaintiff who were not given "full consideration" and unlawfully rejected for NBMS's and by being forced to opt against enrollment given the lack of adequate finances that should have been granted to those applicants.

67. Some applicants, like Plaintiff that were prejudiced just opted just go farther in debt by $54,000. In Plaintiff's case, her reliance on OSU's misrepresentations and negligence caused her to miss other college scholarship opportunities. The cumulative damages are in the millions of dollars to these students like Plaintiff who were improperly overlooked for NBMS's, because of OSU's misrepresentations, fraud and negligence.

68. Plaintiff and other applicants were justified and reasonable in their reliance upon the written website promises providing for "full consideration" of those submitting only their GPA's and class rank.

### FRAUD

**69.** In contrast to negligent misrepresentation, the Ohio Supreme Court set the standard for fraud: To prove a claim for common law fraud , a plaintiff must prove: (a) a representation or, when there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable

reliance upon the representation or concealment, and (f) resulting injury proximately caused by the reliance.

70. Like the above facts applicable to prove negligent misrepresentation, OSU's website represented there would be "full consideration" of those applicants who did not submit ACT/SAT scores.

71. A prospective student like Plaintiff has a right to rely on OSU's website representations of "full consideration" or non-penalizing consideration before making the decision to submit ACT/SAT test scores to OSU.

72. Those websites are considered to be an accurate conduit for providing prospective applicants with admission information including the NBMS scholarship criteria.

73. The information published on it's website is supposed to be an accurate OSU commitment to prospective students to entice applications in light of the COVID 19 pandemic where prospective students encountered difficulties sitting for ACT/SAT testing.

74. When OSU entices or solicits those students with promises and commitments, those promises and commitments must be followed.

75. Unfortunately, for a number of prospective students, there was a pattern of defects and deviations, an intentional or reckless disregard by OSU as to whether those promises and commitments were being followed.

76. These written promises and commitments are directly material and germane to those considered for the award of the NBMS.

77. Following the announced financial aid awards by OSU, it is not surprising that there was a concerted effort to stonewall Plaintiff from gathering information following her efforts to establish her rank.

78. OSU has continued to stonewall Plaintiff and has not provided one document identifying the decision makers, the process of ranking applicants, and criteria for separating applicants.

79. Regarding the falsity of the OSU's website representation of "full consideration", the statistics of NBMS awards as contained in the responses to the Request 1 yields a minimal consideration (19%) to those that did not submit ACT/SAT scores or 1 out of 5 chance.

80. OSU had a duty to disclose the huge inequality of consideration or at a minimum not falsely claim "full consideration" was being given to those not submitting their ACT/SAT scores. OSU cannot have it both ways.

81. OSU's decision on maintain this false information its website is calculated and deliberate.

## ORDINARY NEGLIGENCE

82. To prove negligence under Ohio law, a plaintiff must establish the existence of a duty, a breach of the duty, and an injury proximately resulting therefrom.

83. The duty OSU has to its applicants is to distribute available monies in a manner that is fair, open, and consistent with the manner conveyed to the public. That OSU coaches owed a duty of care to plaintiff as a student athlete to properly know the criteria and advise and communicate accurate criteria to Plaintiff. The OSU Undergraduate Director of Admissions and others had a similar duty to develop criteria and rank applicants based upon the criteria stated on the OSU website.

84. That OSU breached that duty by failing to follow its own guidelines for distribution of those monies shortchanging Plaintiff and other applicants for the NBMS.
85. That OSU coaching staff breached their duty to provide accurate information to Plaintiff by not knowing that the OSU office of undergraduate admissions was unfairly relying on ACT/SAT scores test as a primary means to award NBMS's to its eligible incoming 2021 class to the detriment to those who did not submit test scores.
86. That the breach of duty to fairly distribute those monies and failure to so properly advise applicants of the disparity was a proximate cause or a substantial contributing factor in causing Plaintiff and others damages.
87. Plaintiff suffered a tangible and intangible losses of in excess of $75,000.

## BREACH OF CONSUMER FRAUD STATUTES

88. Ohio Statutes 1345 and rules in chapter 109 are laws and rules respectively that are intended to prevent unfair or deceptive consumer sales practices.
89. In terms of the above statutes, OSU is a supplier engaged in the business of consumer transactions by soliciting prospective students to enroll at OSU.
90. OSU is in the business of soliciting prospective students by charging an application fee and further with induces and promises to provide scholarships to those who can meet the criteria listed on its website.
91. Plaintiff and numerous other prospective students were induced and promised scholarships with full consideration, more specifically the NBMS, if they met criteria listed on the OSU website.

92. Plaintiff met the website criteria however, OSU failed to fulfill it's promise of "full consideration" of her application.

93. OSU's "full consideration" commitment has not been met when, in the case at hand, there is a huge disparity and disadvantage to those applicants who did not take and/or provide an ACT score.

94. OSU's solicitations on it's website are fraudulent, misleading, and deceptive and Plaintiff was damaged by those fraudulent, misleading, and deceptive practices.

## PROMISSORY ESTOPPEL

95. Promissory Estoppel in Ohio s a quasi contractual concept where a court in equity seeks to prevent injustice by effectively creating a contract where none existed. Under Ohio law, a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

96. To establish a claim of promissory estoppel under Ohio law, the plaintiff must prove the following elements: (1) a clear and unambiguous promise; (2) reliance upon the promise by the promisee; (3) reliance by the promise that is both reasonable and foreseeable; and (4) injury to the promise as a result of the reliance.

97. In the at hand case, OSU's promise was to give "full consideration" to all prospective student applicants who meet the website stated criteria. OSU's website criteria does not require an applicant to submit an ACT/SAT examination.

98. In spite of OSU's claimed commitment to fairness and equality, undergraduate admissions staff failed to follow its own criteria of giving such "full consideration" to those applicants and deceived and prevented student applicants like plaintiff who did not take or submit ACT/SAT scores from receiving financial aid such as the NBMS.
99. Plaintiff and other applicants paid an application fee to OSU for "full consideration" of their application even though those applicants did not take or submit ACT scores.
100. Plaintiff also relied on the promise her application would be given "full consideration."
101. Plaintiff's reliance on the website promises are both reasonable and foreseeable.
102. Plaintiff suffered damages as a result in excess of $75,000.

**WHEREFORE**, plaintiff prays for judgment against the defendant as follows:

1. For reasonable damages in an amount to be determined at trial in excess of $75,000 plus any other interest, costs, attorney fees, and any other relief the court deems just and equitable.
2. For injunctive relief that OSU be ordered correct its website to fully disclose the number of NBMS's awarded per year, the true percentage differences in awarding NBMS for those considering not to submit ACT/SAT test scores if that policy continues, and to remove the "full consideration" language from the website unless equality of awards are assured and followed.
3. A court ordered decree assuring the website representations are followed.
4. For injunctive relief that OSU be ordered to pay plaintiff her damages based upon promissory estoppel.

5. For punitive damages necessary to punish and deter OSU from making such false, deceptive, and misleading representations and further punish and deter OSU for attempting hide and cover up this ill-conceived and poorly executed government program.

Dated: 12/28/2022, 2022

By: *Reese C. Dehen*
Reese C. Dehen
14806 Bowers Drive NW
Ramsey, MN 55303
reesedehen@gmail.com
612-719-0491